# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **LEIGH GULLION MEADOWS,**   Plaintiff | ) ) ) | |
| v. | ) ) ) ) ) | Civil Action No. 1:04cv00091 **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHART**,  Commissioner of Social Security,   Defendant | ) ) **)** | By:  **P**AMELA **M**EADE **S**ARGENT United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand to the ALJ for further consideration.

## *I. Background and Standard of Review*

Plaintiff, Leigh Gullion Meadows, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Meadows protectively filed her initial applications for DIB and SSI on or about December 28, 2001, alleging disability as of September 16, 2001, based on a head injury. (Record, ("R."), at 59-62, 74, 276-79.) Meadows's claims were denied initially on June 12, 2002. (R. at 39-41, 42, 46, 47.) Meadows did not pursue these claims further. Instead, she protectively filed subsequent applications for DIB and SSI on or about November 14, 2002, alleging disability as of September 16, 2001, based on impaired memory, lack of patience, pain, headaches and mental instability. (R. at 63-66, 96, 286-89.) These claims were denied both initially and on reconsideration. (R. at 42-46, 47, 49-51, 291-96, 298-300.) Thereafter, Meadows requested a hearing before an administrative law judge, ("ALJ"), (R. at 52.) A hearing was held on October 28, 2003, at which Meadows was represented by counsel. (R. at 338-62.)

By decision dated February 12, 2004, the ALJ denied Meadows's claims. (R. at 21-29.) The ALJ found that Meadows met the disability insured status

-2-

requirements of the Act for DIB purposes through the date of the decision. (R. at 29.) The ALJ found that Meadows had not engaged in substantial gainful activity since September 16, 2001. (R. at 29.) The ALJ also found that Meadows had severe impairments, namely status post right epidural hematoma with cerebral contusions, pneumothorax, rib fractures and status post arthroscopic subacromial decompression of the right shoulder, but he found that Meadows did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 27, 29.) The ALJ further found that Meadows's allegations regarding her limitations were not totally credible. (R. at 29.) The ALJ concluded that Meadows had the residual functional capacity to perform sedentary[1] and light[2] work. (R. at 29.) Based on Meadows's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Meadows could perform her past relevant work as an office clerk and a sewing machine operator. (R. at 29.) Thus, the ALJ found that Meadows was not under a disability as defined by the Act and was not eligible for benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(f), 416.920(f) (2004).

After the ALJ issued this decision, Meadows pursued her administrative appeals, (R. at 16), but the Appeals Council denied her request for review. (R. at 12-15.) Meadows then filed this action seeking review of the ALJ's unfavorable

---

[1]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2004).

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2004).

decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2004). The case is before this court on Meadows's motion for summary judgment filed January 14, 2005, and on the Commissioner's motion for summary judgment filed April 26, 2005.

## *II. Facts and Analysis*

Meadows was born in 1967, (R. at 63, 343), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2004). She has an eleventh-grade education and subsequently obtained her general equivalency development, ("GED"), diploma. (R. at 80, 343.) Meadows has past work experience as a certified nursing assistant, ("CNA"), a rip operator, an office clerk and a sewing machine operator. (R. at 75, 343-45.)

At her hearing, Meadows testified that she experienced pain in her low back, right shoulder and head. (R. at 345.) She noted severe headaches since being thrown from a horse and undergoing brain surgery in September 2001.[3] (R. at 345.) Meadows further testified to experiencing depression secondary to her physical impairments. (R. at 346.) She testified that she had undergone a sacroiliac, ("SI"),

---

[3]Meadows was airlifted to Wellmont Bristol Regional Medical Center, ("BRMC"), on September 16, 2001, after being thrown from a horse and hitting the right side of her head, chest and face against a fence post. (R. at 113, 120.) She underwent a right temporoparietal craniotomy and evacuation of an acute large right temporoparietal epidural hematoma. (R. at 114.) She remained under the care of Dr. Matthew Wood Jr., M.D., at BRMC until she was discharged on October 11, 2001, to Quillen Rehabilitation Hospital for further traumatic brain injury rehabilitation. (R. at 113-15.) Her discharge diagnoses were a severe intracranial injury secondary to right acute epidural hematoma with cerebral contusions and a mid-brain contusion, a right pulmonary contusion and a pneumothorax secondary to rib fractures, a right clavicle fracture and respiratory failure compounded by the severe intracranial injury. (R. at 113.)

nerve block for her back pain two to three weeks previously. (R. at 347.) The ALJ held the record open for 30 days to allow for the inclusion of these records. (R. at 348.)

Meadows testified that she had received treatment for her emotional difficulties for more than a year previously. (R. at 348.) She stated that she performed "average" in school. (R. at 349.) She further stated that the used to work a full-time job, run her household and participate in leisure activities like camping, horseback riding and attending ballgames. (R. at 349.) However, Meadows testified that since her brain injury, she never left her house. (R. at 349.) She stated that she had not driven in months since her daughter took her keys away from her because she was having suicidal thoughts. (R. at 349-50.) Meadows testified that she had no social life, indicating that she did not like to be around anyone. (R. at 350.) She stated that Dr. Ashvin A. Patel, M.D., had prescribed Seroquel, Wellbutrin and Trileptal. (R. at 353.)

Meadows, who stated that she was right-handed, testified that she had a decreased range of motion in her right arm, stating that she could raise it overhead, but with pain, and that she did not have good grip. (R. at 350.) She testified that she had undergone shoulder surgery approximately one month previously, but had not yet begun physical therapy. (R. at 350-51.) She stated that she was taking Percocet for her shoulder pain and that she had to lie down or rest for three or four hours during the day. (R. at 351.) Meadows further stated that she took hot showers and applied heat to try to relieve her pain. (R. at 351.) She stated that she had difficulty sleeping due to pain and racing thoughts. (R. at 352.) Meadows stated that she felt

discouraged, which, in turn, made her anxious. (R. at 352.) She testified that she experienced mood swings, noting violent tendencies, and she described her energy level as "[n]ext to none." (R. at 352.)

Donna Bardsley, a vocational expert, also was present and testified at Meadows's hearing. (R. at 355-59.) Bardsley classified Meadows's past work as a CNA and as a rip operator as medium[4] and semiskilled, her work as an office clerk as sedentary and skilled and her work as a sewing machine operator as light and semiskilled. (R. at 355.) Bardsley was asked to consider a hypothetical individual of Meadows's height, weight, education and work history who could perform light and sedentary work and who had an emotional disorder resulting in mild to moderate restrictions on work-related activities. (R. at 355-56.) Bardsley testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a sales clerk, a cashier, an order clerk, a food service worker, a cleaner, a hand packager, a sorter and an assembler. (R. at 356.) Bardsley was next asked to assume the same individual, but whose emotional disorder placed greater than moderate restrictions on the ability to perform work-related activities. (R. at 356.) Bardsley testified that such an individual could perform no jobs. (R. at 356.) Next, Bardsley was asked to consider an individual with the restrictions set forth in Dr. Stiefel's physical assessment dated May 2, 2003. (R. at 357.) Bardsley testified that such an individual could perform no jobs. (R. at 357.) Next, Bardsley was asked to consider an individual with the physical limitations as set forth in the first

---

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2004).

hypothetical, but who had the mental limitations as set forth in a Mental Residual Functional Capacity Assessment completed by Eugenie Hamilton, Ph.D., a state agency psychologist. (R. at 242-45, 357-58.) Bardsley testified that all jobs would be eliminated. (R. at 358.) Finally, Bardsley testified that an individual with the limitations testified to by Meadows would not be able to work. (R. at 359.)

In rendering his decision, the ALJ reviewed records from Wellmont Bristol Regional Medical Center; Highlands Neurosurgery; Dr. Jennifer Stiefel, M.D.; Appalachian Orthopaedics; Mountain Empire Neurological Associates; Johnston Memorial Hospital Physical Therapy and Rehabilitation Department; Bob Ewing, Ph.D., a licensed clinical psychologist; William E. Stanley, M.Ed., a licensed psychological examiner; Dr. Randall Hays, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; Julie Jennings, Ph.D., a state agency psychologist; James H. Bangle, a licensed clinical social worker; Heatherwood Counseling Center; Ralph Ramsden, Ph.D., a licensed clinical psychologist; and Dr. Bert E. Tagert, M.D. Meadows also submitted medical records from Dr. Tagert; Bristol Surgery Center; Southeastern Pain Management Center; Dr. Victor Freund, M.D.; Dr. Dennis Aguirre, M.D.; Bristol Regional Counseling Center; and Dr. Stiefel to the Appeals Council.[5]

The Commissioner uses a five-step process in evaluating DIB and SSI

---

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 12-15), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

claims.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2004).  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2004).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy.  *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

In a decision dated February 12, 2004, the ALJ found that Meadows retained the residual functional capacity to perform sedentary and light work and, thus, could return to her past relevant work as an office clerk and a sewing machine operator. (R. at 29.)  In her brief, Meadows argues that substantial evidence does not support the ALJ's rejection of the opinions of her treating physician, Dr. Stiefel, in finding that

her shoulder did not preclude her from performing sedentary and light work. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-10.) Meadows further argues that substantial evidence does not support the ALJ's failure to find that she suffered from a severe mental impairment. (Plaintiff's Brief at 10-11.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

It is well-settled that the ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, I find that substantial evidence supports the ALJ's rejection of Dr. Stiefel's opinions regarding Meadows's shoulder impairment and her residual functional capacity based thereon. Meadows notes that Dr. Stiefel completed a residual functional capacity assessment on May 2, 2003, more than 18 months after the horseback riding injury that triggered her shoulder impairment and more than one year after she relayed her difficulties to her neurosurgeon in March 2002. Although I can find no such assessment contained in the record on appeal, that is of no moment because the fact remains that any such assessment would have been rendered approximately four months prior to Meadows's rotator cuff surgery on September 29, 2003. I further note that treatment notes from Dr. Stiefel that post date Meadows's shoulder surgery are irrelevant to her shoulder impairment in that they deal exclusively with her complaints of bilateral hip pain with radiation into the left leg. (R. at 336.)

Next, Meadows argues that the record contains treatment notes from Dr. Tagert,

her treating orthopaedic surgeon, following her shoulder surgery that support her contention of continuing severe difficulties. Again, I disagree. In November 2003, Dr. Tagert recommended physical therapy, but Meadows declined. (R. at 306.) He noted continued severe pain while reaching upward, and a decreased range of motion. (R. at 306.) However, Dr. Tagert placed no restrictions on Meadows's work-related activities. On December 9, 2003, Meadows's rotator strength was intact and x-rays of the right shoulder showed only some sclerosis of the acromioclavicular, ("AC"), joint. (R. at 304.) Dr. Tagert again recommended physical therapy and placed no restrictions on Meadows. (R. at 304.) In March 2004, examination of the shoulder revealed tenderness over the AC joint, a positive cross chest maneuver and moderately painful forward elevation. (R. at 302.) Nonetheless, her rotator cuff strength was 4/5 and she declined an AC injection. (R. at 302.) Again, Dr. Tagert imposed no restrictions. However, Meadows noted that at the time that she had been in a motor vehicle accident on February 27, 2004, which apparently aggravated her shoulder. (R. at 302.) I find that Dr. Tagert's notes do not support Meadows's contention that she suffers from a continuing debilitating shoulder impairment. Although she exhibited a decreased range of motion and some sclerosis of the AC joint, her rotator cuff strength was normal, and Dr. Tagert imposed no restrictions on Meadows's work-related activities.

Likewise, the other notes contained in the record, both prior to and following Meadows's shoulder surgery, do not support a finding that she suffers from a disabling shoulder impairment. Meadows began complaining of intermittent right shoulder pain in February 2002. (R. at 175.) In March 2002, she exhibited a decreased range of motion, marked tenderness over the bicipital tendon head and

-11-

Case 1:04-cv-00091-PMS   Document 25   Filed 07/07/05   Page 11 of 16   Pageid#: 88

marked crepitus. (R. at 159.) She was diagnosed with a probable right frozen shoulder. (R. at 159.) In May 2002, Meadows again exhibited a decreased range of motion of the shoulders. (R. at 192.) An MRI showed some tendinosis, but no definite rotator cuff tear. (R. at 192.) She was diagnosed with a right shoulder strain with possible structural injury. (R. at 192.) Physical therapy was recommended. (R. at 192-93.) In November 2002, Meadows aggravated her shoulder in a motor vehicle accident. (R. at 171.) She was treated conservatively. (R. at 171.) On December 12, 2002, Dr. Tagert noted that Meadows did not complete the full eight weeks of physical therapy as scheduled. (R. at 193.) A physical examination showed diffuse tenderness of the shoulder, pain with flexion and elevation, apprehension and a positive cross chest maneuver. (R. at 193.) However, Meadows's rotator cuff strength was normal. (R. at 193.) Dr. Tagert recommended shoulder injections due to Meadows's reluctance to participate in physical therapy. (R. at 193.) These injections resulted in fairly significant relief. (R. at 193.)

In January 2003, Dr. Tagert again recommended a four-week course of physical therapy in hopes of avoiding surgery. (R. at 266.) He noted that Meadows had obtained some relief from the shoulder injection, but he further noted that she missed several physical therapy sessions. (R. at 267.) A physical examination revealed pain with flexion, elevation and cross chest maneuver. (R. at 267.) Meadows's strength was intact. (R. at 267.) She attended physical therapy sessions from January 29, 2003, through February 25, 2003, over which time she missed two sessions. (R. at 204-11.) On February 18, 2003, Meadows reported improved shoulder movement and her range of motion was increased. (R. at 206.) Again, on February 20, 2003, she exhibited an increased range of motion of the right shoulder, increased right shoulder

-12-

strength, increased functional use of the right upper extremity and decreased right shoulder pain. (R. at 204.) She was diagnosed with right shoulder impingement. (R. at 204.) On June 18, 2003, Meadows reported chronic right shoulder pain. (R. at 272.) However, on physical examination, Dr. Stiefel noted that she was in no acute distress. (R. at 272.)

In the month following her shoulder surgery, and again in December 2003, Meadows received injections that controlled her shoulder pain. (R. at 309, 310.) Nonetheless, Meadows declined further injections, claiming that they did not relieve her pain. (R. at 302, 303.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). In March 2004, Meadows exhibited a full range of motion of the cervical spine and upper extremities with normal motor strength. (R. at 318.) Deep tendon reflexes in the upper extremities were 2+. (R. at 318.) She was treated conservatively. In April 2004, although she exhibited muscle spasm in the cervical musculature bilaterally in the upper shoulder area, her deep tendon reflexes, strength and sensation of the upper extremities were intact and equal bilaterally. (R. at 334,) She was diagnosed with cervical strain with muscle spasm and was treated conservatively. (R. at 334.)

I further find that Meadows's activities of daily living belie any contention that she suffers from a disabling shoulder impairment. For instance, Meadows reported watching television, seeing her son off to school, picking up her daughter from school, preparing meals, performing housework and taking her daughter to work. (R. at 214, 259.)

-13-

Case 1:04-cv-00091-PMS   Document 25   Filed 07/07/05   Page 13 of 16   Pageid#: 90

For all of these reasons, I find that substantial evidence supports the ALJ's rejection of Dr. Stiefel's opinions regarding Meadows's shoulder impairment. For the same reasons, I also find that substantial evidence supports the ALJ's finding that Meadows can perform light and sedentary work.

Lastly, Meadows argues that the ALJ erred by finding that she did not suffer from a severe mental impairment. (Plaintiff's Brief at 10-11.) I agree. The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2004). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routing work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2004). The Fourth Circuit held in *Evans v. Heckler*, that ""'[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'"" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

Here, the record reveals that Meadows was diagnosed with mental impairments by every psychological source who examined her personally or who rendered an opinion based only on a review of her medical records. For instance, Dr. Stiefel first

-14-

Case 1:04-cv-00091-PMS   Document 25   Filed 07/07/05   Page 14 of 16   Pageid#: 91

diagnosed depression in December 2001, and she treated her with psychotropic medications. (R. at 179.) In June 2002, Dr. Tagert also diagnosed Meadows with depression and prescribed Wellbutrin. (R. at 173.) The following month Dr. Tagert prescribed Trazadone. (R. at 173.) In February 2003, psychologist Ewing and psychological examiner Stanley diagnosed Meadows with a major depressive disorder, recurrent, mild to moderate, without psychotic features, generalized anxiety disorder, mild to moderate, moderate recent and remote memory impairment and average intellectual functioning. (R. at 216.) They further concluded that Meadows was moderately limited in her ability to maintain concentration and persistence and to interact socially. (R. at 217.) Later that month, state agency psychologist Hamilton concluded that Meadows suffered from memory impairment, major depressive disorder, recurrent, mild to moderate, without psychotic features, and generalized anxiety disorder. (R. at 227-41.) Hamilton found, among other things, that Meadows experienced moderate difficulties in maintaining concentration, persistence or pace. (R. at 237.) Hamilton also completed a mental assessment, finding that Meadows was moderately limited in nine areas of work-related mental abilities. (R. at 242-43.) These findings were affirmed by state agency psychologist Jennings. (R. at 227, 244.) Bangle, a licensed clinical social worker, diagnosed Meadows with major depressive disorder, recurrent, moderate, and generalized anxiety disorder. (R. at 255.)

In July 2003, psychologist Ramsden diagnosed Meadows with a mood disorder due to a medical condition with major depressive features, an adjustment disorder with mixed anxiety and depressed mood. (R. at 261.) Ramsden further concluded that Meadows had a poor or no ability to relate predictably in social situations and to demonstrate reliability and a fair ability to relate to co-workers, to deal with the

-15-

public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently and to maintain attention and concentration. (R. at 262-63.) Therefore, the uncontradicted psychological evidence shows that Meadows suffers from some mental impairments, including a major depressive disorder, recurrent, mild to moderate, without psychotic features, generalized anxiety disorder, mild to moderate, moderate recent and remote memory impairment, a mood disorder and average intellectual functioning, at least some of which should be deemed severe given the limitations noted. (R. at 216, 230, 232, 255, 331-32.)

For these reasons, I find that substantial evidence does not support the ALJ's finding that Meadows does not suffer from a severe mental impairment.

*III. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, Meadows's motion for summary judgment will be denied, and the case will be remanded to the ALJ for further consideration of Meadows's mental impairments and their effect on her ability to perform work-related activities.

An appropriate order will be entered.

DATED: This 7th day of July, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE